UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RANDALL B. HOFLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09-cv-00172-JAW |
| | ) | |
| RICHARD LAHAYE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

Randall Hofland began this action against the Town of Searsport (Maine), the Searsport Police Department, and Richard LaHaye, the Chief of the Searsport Police Department, on May 4, 2009, when he filed his original complaint. The complaint appeared targeted at the actions of the police department and certain officers in connection with the events of October 23, 2008,[1] surrounding a 'safety check' type of a roadblock set up in the vicinity of a driveway where Hofland claimed to have stored most of his personal and business property. Hofland admits in his complaint that this confrontation with the police prompted him to flee and to remain 'on the run,' so to speak, until he entered the Stockton Springs Elementary School on October 31, 2008, and caused, what police describe as, a hostage situation involving adults and youth. Hofland has been convicted by a jury and sentenced as a consequence of that conduct, although he was apparently acquitted on a count relating to Defendant Danielson's testimony that Hofland pointed a gun at her during the October 23, 2008, roadblock.

Hofland's original complaint under this case number mentioned his longstanding relationship with Captain George Perkins of Stockton Springs and an ongoing dispute with

---

[1] In his opening paragraph, Hofland dates the events at October 23, 2009, a date which had not yet occurred. Later in the complaint it becomes clear he is referring to the fall of 2008.

Perkins and his family over property matters. Hofland ominously mentioned in Paragraph 11[2] of his complaint that other state officials and Captain Perkins and his cohorts had also been involved in a major conspiracy, but indicated that those others would be dealt with separately in other cases to be filed in Maine and New Hampshire. True to his word, Hofland has brought a number of actions in this court and in the New Hampshire United States District Court, including Hofland v. Cyr, 1:09-cv-00398-JD (D.NH.) in which judgment entered for defendants. Apropos that action, the First Circuit Court of Appeals denied Hofland's appeal on February 4, 2011, noting "that this is the sixth appeal that Hofland has recently pursued, each of which has been summarily affirmed. In light of this prior litigation, we warn Hofland that any future frivolous appeal may be subject to sanctions." Hofland v. Cyr, 10-1880, Doc. 00116167105 (1st Cir. Feb. 4, 2011).

These various actions targeted not only Captain Perkins and his family but also a number of judges, prosecutors, the Governor of Maine, other law enforcement agencies, and assorted individuals, including Hofland's ex-wife, Wendy.

The history of this particular case involving the Searsport police is far from simple. It is currently the one remaining active Hofland case on our docket and it is one of the first cases Hofland filed in this court. Service has never been made on any of the defendants because the complaint has not been fully screened pursuant to 28 U.S.C. § 1915(e)(2) and Hofland has been an incarcerated prisoner for the entire history of the litigation, requiring that his complaints be screened before any of the defendants are served. See 28 U.S.C. § 1915(e)(2) ("[T]he court shall

---

[2] Included with Hofland's Fourth Amended Complaint, the subject of this screening, is a document entitled "Correction to Complaint" (Doc. No. 75-2) in which Hofland makes it clear that he repudiates and recants everything he said in Paragraph Eleven of his initial complaint (Doc. No. 1, ¶ 11, Page ID Nos. 7 &8) about pursuing these other individuals in separate actions. This appears to be a move to circumvent the fact that Hofland's complaints against the others have all been dismissed with prejudice in separate actions and he attempts to collect them all together again in this pending fourth amended complaint.

dismiss the case <u>at any time</u> if the court determines that … the action …is frivolous or malicious.")(emphasis added).

Following some preliminary litigation over motions for attachment, Hofland filed his first amended complaint on May 21, 2009. He then moved to stay his case because of pending criminal charges in the state court. I ultimately entered a stay in this case on June 4, 2009, although litigation proceeded on the other seven cases that Hofland filed in this court between April 24, 2009, and February 11, 2011. I stayed this particular action because it seemed to me it was closely associated with the criminal charges that had been brought against Hofland in state court and I wanted to give him every benefit in terms of being able to litigate this discrete matter. I did not realize at the time of the initial stay that it would be close to two years before Hofland's state criminal charges proceeded to trial.[3]

I have earlier denied Hofland leave to amend in this case and on January 14, 2010, Chief Judge Woodcock affirmed that determination, remarking:

> Mr. Hofland's amended complaint is replete with "the-defendant-unlawfully-harmed-me accusations" and "naked assertion[s]," falling short of the pleading standard for Federal Rule of Civil Procedure 8 articulated by the United States Supreme Court. <u>Ashcroft v. Iqbal</u>, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). In addition, government officials performing judicial, legislative or prosecutorial functions are afforded absolute immunity, <u>Marr v. Me. Dep't of Human Servs.</u>, 215 F.Supp.2d 261, 267 (D.Me.2002), and Mr. Hofland's claims against district attorneys, judges, and police officers are not allowed. Accordingly, the dismissal of Mr. Hofland's motion is not in error.

<u>Hofland v. LaHaye</u>, 1:09-cv-00172-JAW, 2010 WL 231737, 2 (D. Me. Jan. 14, 2010).

---

[3] Chief Judge Woodcock summarized in a February 2010 opinion that Hofland had six lawsuits pending from the 2009 docket and aptly described Hofland as "a frequent filer" and a "relentless" litigator who has created a "procedural tangle." <u>Hofland v. Governor</u>, 1:09-cv-00162-JAW, 2010 WL 672903, 1 -2 (D.Me. Feb. 22, 2010) (citing <u>Hofland v. Governor,</u> (Doc. No. 43) , <u>Hofland v. Perkins</u>, 1:09-cv-00201-JAW, (Doc. No. 38) (same); <u>Hofland v. Ross</u>, 1:09-cv-00173-JAW, (Doc. No. 52); <u>Hofland v. Westrum</u>, 1:09-cv-00218-JAW, (Doc. No. 37) (same); <u>Hofland v. Thompson</u>, 1:09-cv-00174-JAW; <u>Hofland v. LaHaye</u>, 1:09-cv-00172-JAW). Since that date there has been lots of other activity further tangling the dockets related to Hofland. To address the screening of this fourth amended complaint I need not identify all this litigation or belabor the procedural tangles.

3

On November 1, 2010, Hofland filed another motion to amend accompanied by a proposed third amended complaint. (Doc. No. 53.) I denied this motion on November 4, 2010. (Doc. No. 55.) This Court denied Hofland's objection to that order on December 2, 2010. (Doc. No. 62.)

Finally, due to the motion to consolidate this case with his new case, Hofland v. LaHaye, 1:11-cv-00053-JAW (D.Me.)[4], on March 18, 2011, I gave Hofland leave to file an amended complaint "that addresses his allegations concerning the events of October 23, 2008." (Procedural Order, Doc. No. 65.) My order was specific in its details:

> 1.) The amended complaint may name no more than twelve defendants (the current version of the complaint names nine). Hofland may determine, for instance, that there is no reason to name both the Town of Searsport and Searsport Police Department as defendants. In his amended complaint he may choose to name whatever defendants he deems appropriate, provided, however, the total number of defendants may not exceed twelve.
>
> 2.) The complaint itself should be no longer than twenty pages, without exhibits or memoranda in support of the complaint. There is no reason to submit such material. The complaint must be divided into numbered paragraphs as required by the Federal Rules of Civil Procedure. The current complaint is nine pages long and the amendment to it is two pages long.

(Id. at 2.) Central to my concern at the time was that Hofland alleged in his new case, Hofland v. LaHaye, 1:11-cv-00053-JAW (D. Me.), that following his January 2011 trial he had been acquitted in connection with the events associated with the roadblock of October 23, 2008,[5] and he recited new allegations concerning information he learned at trial about these Searsport events. I wanted to give Hofland one last chance to amend towards presenting a complaint that

---

[4] This new case, subsequently dismissed by this court, contained many more claims and defendants than those associated with the Searsport police or the activities of October 23, 2008. The caption lists forty-four separate defendants including at least two Maine state court judges, a district attorney, two municipalities, a county, and the Governor.

[5] Hofland had been convicted of other, more serious charges involving a different incident in a different locale. He is currently serving a substantial sentence of imprisonment in the Maine state correctional system.

4

actually dealt with the conduct of the Searsport police in connection with the October 23, 2008, roadblock.

In response to my order, Hofland has filed a thirty-four page complaint with an eight-page supplement and a one-page correction. (Doc. Nos. 75, 75-1, 75-2.) It is unclear how many defendants Hofland intends to name in this fourth amended complaint, because he merely captions it Richard LaHaye, Jr., et al. It is apparent that 'Version 4' is not narrowly tailored to address the events of October 23, 2008, and the immediate aftermath, but rather it is an attempt to revive many counts or 'claims' that have already been addressed by the court, most recently in the Hofland v. LaHaye, 1:11-cv-00053 (D. Me.) complaint referenced above. And, although Hofland has set forth a flurry of 'claims' -- even with so much water under the bridge -- he has not attempted to present the court with 'counts' so as to distinctly specify the legal premise of his federal causes of action.

**Fourth Amended Complaint Allegations
Pertaining to Searsport Police/October 23, 2008, Events**

Hofland's claims in this proposed fourth amended complaint are as follows:

- *Claim 1* relates to a conversation between George Perkins and Jason Andrews of the Maine State Police that occurred on February 16, 2007.[6]
- *Claim 2* purports to be a claim of libel against State Trooper Andrews. It does not state a federal claim, nor does it sufficiently plead state law defamation as the alleged defamatory statements are never identified.
- *Claim 3* is against George Perkins alleging that he used the United States mail in furtherance of a conspiracy by filing an action in the Belfast District Court in February of 2007.
- *Claim 4* is also against George Perkins and claims some illegal use of the United States mail because Perkins is alleged to have sent copies of an inventory of items he claims Hofland stole from him to the State Police, the Maine Attorney General, and "local" police officials. It does not specify if the Searsport police were involved or not. The inventory was sent on April 19, 2007.

---

[6] There is no cognizable legal claim in these conclusory allegations about a RICO conspiracy. See Brown v. Ferrara, 2:10-cv-00523-GZS, 2011 WL 1637928 , 9 (D. Me. Apr.. 28, 2011) (recommended decision).

5

- *Claim 5* is also primarily directed at George Perkins and covers the time period from February through July 2007, alleging that Perkins communicated with other family members out of state via telephones and the internet furthering his legal action against Hofland. During this period Perkins and Hofland were litigating dueling protection actions pursuant to 5 M.R.S. §§ 4651, et. seq. in the Belfast District Court.
- *Claim 6* represents Hofland's assertion that Perkins contacted a state trooper named Jonah O'Roak, in May 2007 vis-à-vis a restraining order in PA-07-018, presumably as a result of the litigation referenced in Claim 5.
- *Claim 7* relates to a Belfast District Court judge who Hofland asserts repeatedly delayed proceedings in the protection actions. Hofland also faults an attorney, Eric Walker, in this claim. The judge and Walker have been named defendants in other actions previously dismissed. See Hofland v. LaHaye, et. al., 1:11-cv-00053-JAW (D. Me.).
- *Claim 8* seems entirely directed against two separate state court judges and hearings they held on June 25, 2007, and July 10, 2007. Hofland is unhappy about the way the proceedings were conducted, claiming mail fraud and obstruction of justice in conclusory fashion.
- *Claim 9* relates solely to the July 10, 2007, hearing and pertains to the Sheriff of Waldo County willfully concealing material evidence. Storey was previously dismissed when named as a defendant in a habeas petition filed by Hofland in 2009. Hofland v. Story(sic), 2:09-cv-00343-JAW.
- *Claim 10* pertains to the July 10, 2007, hearing and malfeasance by various parties associated with that proceeding, none of whom appear to be any of the members of the Searsport police department.
- *Claim 11* is against a state court judge who allegedly defrauded Hofland as part of a RICO conspiracy as the result of the outcome of the protection action in state court.
- *Claim 12* is a due process/equal protection claim arising from the same events as in Claim 11.
- *Claim 13* maintains that Scott Storey, the Waldo County Sheriff, continued to conceal material evidence (not specified as to what evidence) through 2010.
- *Claim 14* does relate to the October 23, 2008 events. According to Hofland, Richard LaHaye and Jonah O'Roak, a state trooper, planned and executed a roadblock and "safety check" which blocked Hofland's access to a driveway leading to his storage facilities. Two months earlier Michael Larrivee, a Searsport Police officer and a defendant in this case, had entered this same property and confronted Hofland, refusing to leave the premises when ordered to do so by Hofland. The August 26, 2008, incident was only brought to light during the criminal proceedings in state court as a result of Hofland's Brady v. Maryland, 373 U.S. 83 (1963) demands for the production of records, many of which were in Larrivee's custody.
- *Claim 15* relates to defendant Jessica Danielson and alleges that at the time of the roadblock Danielson accused Hofland of having a gun and threatening her with it. (It appears that charges stemming from this incident were the charges resulting in the acquittal during the state court trial.) Hofland claims that Danielson's claims were false.
- *Claim 16* mentions Chief LaHaye and Steven Saucier, both named defendants, who are accused of libeling Hofland by repeating Danielson's claims of having seen a Glock pistol. Saucier and LaHaye repeated the claims in various police reports and disseminated them to the media and on the internet.

- *Claim 17* blames the events of October 23, 2008, for "inciting" Hofland to take action on October 31, 2008, during the Stockton Springs Elementary School incident which did result in Hofland's conviction for serious criminal charges. According to Hofland, those events would never have happened but for LaHaye and Danielson's "beligerant libels." The claim goes on to explain that Hofland's divorce matters are, of course, linked to the Searsport police. He does not explain exactly how the Searsport Police or any of the named defendants are linked to his divorce case other than being "implicated in libels disseminated via mail and wire fraud."
- *Claim 18*, against LaHaye, Danielson, and Saucier implicates them in either concealing evidence beneficial to Hofland or falsifying evidence against him. Interestingly, this claim appears to exonerate named defendant Eric Bonney, as the only Searsport police official who did not falsify or conceal evidence.
- *Claim 19* continues to name Danielson and Saucier as persons responsible for Hofland's subsequent conduct and the many media stories about the October 23 incident. In this claim Hofland suggests that Danielson and Saucier committed perjury at his criminal trial.
- *Claim 20* appears primarily directed against LaHaye and accuses him of searching Hofland's storage facilities after October 24, 2008, on false pretenses, for the sole purpose of supporting Perkins's fraudulent claims that Hofland had stolen a vast amount of property and money from him. Gary Boynton and Jason Andrews, now identified as LaHaye's co-conspirators, are not named defendants in this original complaint, but Boynton was previously identified as Perkins's "private eye" in an earlier dismissed lawsuit where he was a named defendant. Hofland v. Perkins, et. al., 1:09-cv-00201-JAW. Andrews, a prior defendant, was identified as a Maine state trooper. Hofland v. LaHaye, et al., 1;11-cv-00053-JAW.
- *Claim 21* is against LaHaye and relates to what is described as the illegal search and seizure of Hofland's Subaru following the October 23, 2008, roadblock.
- *Claim 22* is against Danielson and Darren Moody (who is not a named defendant). It relates to their search of the Subaru, at a towing facility on October 24, 2008. According to Hofland, Danielson and Moody conducted the "inventory search" at LaHaye's specific instruction.
- *Claim 23* alleges that LaHaye and Danielson conspired with Eric Walker, previously identified as a Waldo County Deputy District Attorney, Hofland v. LaHaye, et al., 1:11-cv-00053-JAW, against whom the complaint was dismissed. The purpose of the "conspiracy" was to obtain a search warrant on October 28, 2008, for the Subaru. Hofland claims this search warrant conspiracy was illegal because it was tainted by Danielson's earlier inventory search.
- *Claim 24* is a rather lengthy claim and reiterates that LaHaye and Danielson were involved with others in searches of Hofland's property on October 24 and 28, 2008, and again on November 21, 2008. Hofland again mentions Walker and O'Roak, not defendants in this action, and states in conclusory fashion that a constantly growing number of law enforcement personnel were becoming involved in what he describes as the "Perkins enterprises."
- *Claim 25* resuscitates the "watch list" and implicates Danielson in its origin. The "watch list" has figured in other Hofland cases and appears to involve allegations related to New Hampshire litigation and an alleged threat against a New Hampshire judge. Hofland

7

characterizes this "watch list" as a form of First Amendment retaliation tied to Wendy Hofland's divorce action in New Hampshire. This claim goes on for two and one half pages and appears to range pretty far afield from the Searsport police department.

- *Claim 26*, citing RICO, claims the United States Department of Homeland Security, the Maine State Police and various other governmental agencies all constitute entities that have committed predicate acts under 18 U.S.C. § 1961(1) and engaged in a pattern of racketeering while investigating Hofland. It represents a further nonsensical pleading by Hofland.
- *Claim 27* again attacks ex-governor John Baldacci for hosting the May 20, 2009, "Heroes' Awards" and once more blames Jessica Danielson for various "libels" involving her claim that Hofland had a Glock, a charge which resulted in acquittal. It does not represent any new actionable allegations.
- *Claim 28 is* the height of absurdity, blames a school counselor for the incident at the Stockton Springs School where Hofland has been convicted of kidnapping numerous school children. The counselor is not a named defendant nor will she be.
- *Claim 29* is directed at prosecutors and police officers who allegedly delayed discovery in the state criminal action. Richard LaHaye and Michael Larrivee are the only named defendants mentioned in this claim.
- *Claim 30* seeks to once more resuscitate the claim against a newspaper reporter, Walter Griffin of the Bangor Daily News. Hofland did not like Griffin's coverage of his legal difficulties. This claim has been previously rejected by this court in this very case. (See Doc. No. 35).

*Supplemental Claims*

- *Claim 31* alleges that the Searsport Police Department and the Perkins conspirators joined in a "dual-mode" enterprise (both RICO and traditional tort violations) to commit the theft of thousands of dollars of personal property from Hofland.
- *Claim 32* continues to recite personal property damaged or confiscated by the Searsport police and complains about Danielson's inventory of his property that was seized.
- *Claim 33* appears to be a generalized claim of negligence against the Searsport Police Department because they sided with George Perkins in this case. Perkins, according to Hofland, suffers from mental and psychological disorders.
- *Claim 34* reiterates that Richard LaHaye, Steven Saucier, Jessica Danielson, Darren Moody (not a named defendant) and Michael Larrivee (but not Eric Bonney) engaged in a conspiracy to fraudulently prosecute Hofland for pointing a gun at Jessica Danielson, an act he never committed and for which he was acquitted.[7]

---

[7] Hofland interweaves allegations of Brady v. Maryland, 373 U.S. 83 (1963) and Maine Rule of Criminal Procedure 16 violations concerning discovery for his criminal trial. (See, e.g., Claim 29, Doc. No. 75 at 25.) Only if Hofland succeeds in getting his conviction overturned on this ground would this type of claim be actionable in a 42 U.S.C. § 1983 action. See Heck v. Humphrey, 512 U.S. 477 (1994). As to the charge that led to an acquittal, it is legally implausible to argue that a Brady violation in the context of the criminal trial resulted in any legally cognizable harm. There are additional reasons for disregarding Hofland's assertions regarding the special grand jury indictment, which includes accusations against journalist Walter Griffin for corrupting "members of the Special

8

**Discussion**

With regards to a proceeding in forma pauperis such as this, the United States Congress has directed: "[T]he court shall dismiss the case at any time if the court determines that -- … (B) the action…-- (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). "Dismissals [under 28 U.S.C. § 1915] are often made sua sponte prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints." Neitzke v. Williams, 490 U.S. 319, 324 (1989) (citing Franklin v. Murphy, 745 F.2d 1221, 1226 (9th Cir. 1984)); accord Denton v. Hernandez, 504 U.S. 25, 33 (1992); see also Mallard v. U.S. Dist. Ct. S. D. Iowa, 490 U.S. 296, 307-308 (1989) ("Section 1915(d), for example, authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision.").

The First Circuit recently surveyed the implications of Ashcroft v. Iqbal, 556 U.S. __, __, 129 S.Ct.1937, 1947 -49 (2009) on pleading standards:

> Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible. Iqbal, 129 S.Ct. at 1951 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical.... It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). But cf. Peñalbert–Rosa v. Fortuño–Burset, 631 F.3d 592, 595 (1st Cir.2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual.") (internal quotation marks omitted). If that factual content, so taken, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the claim has facial plausibility. Iqbal, 129 S.Ct. at 1949. "The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case

---

Grand Jury, and the public in general." (Claim No. 30, Doc. No. 75 at 25.) Hofland's allegations of some sort of collusion between Griffin and LaHaye (id. at 27) simply crosses the line from the possible to the implausible as staked out in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2009) and Ashcroft v. Iqbal, 556 U.S. __, __, 129 S.Ct. 1937 (2009).
.

9

for relief." Sepúlveda– Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir.2010) (Souter, J.).

Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). See also Atkins v. City of Chicago, 631 F.3d 823, 832 (7th Cir. 2011) ("So suppose some of the plaintiff's factual allegations are unrealistic or nonsensical and others not, some contradict others, and some are 'speculative' in the sense of implausible and ungrounded. The district court has to consider all these features of a complaint en route to deciding whether the complaint has enough substance to warrant putting the defendant to the expense of discovery … or, in a case such as this (like Iqbal itself), burdening a defense of immunity.") (citations omitted).

**28 U.S.C. § 1915 Screening**

In his Fourth Amended complaint submitted in response to my March 18, 2011, order, Hofland has not operatively named any new defendants although there are references to actions of other individuals in his proposed amended complaint. I now make it clear that there are no additional defendants incorporated into this action. The names that appear in this complaint in addition to the current defendants have already been sued by Hofland in his other cases and/or have nothing to do with the Searsport October 23, 2008, roadblock that is the intended focal point of this action.

With respect to Defendant Bonney, Hofland's own pleading absolves Bonney of any legal liability. (See Claim 18; see also Claim 34.) The complaint must be dismissed as to this defendant. Atkins, 631 F.3d at 831-32 ("And (another rule that antedates Twombly and Iqbal) he can plead himself out of court by pleading facts that show that he has no legal claim.").

As for the Town of Searsport and the Searsport Police, Hofland has not stated a plausible claim of municipal liability on a theory of failure to train. There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of

Canton v. Harris, 489 U.S. 378, 385 (1989); Burrell v. Hampshire County, 307 F.3d 1, 10 (1st Cir.2002). These two entities could be held liable under 42 U.S.C. § 1983 were it to appear that the alleged injury to Hofland was caused by their failure to train. "The liability criteria for failure to train claims are exceptionally stringent, however." Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir.1998) (citing City of Canton v. Harris, 489 U.S. 378, 388-89 (1989)). The proposed Fourth Amended Complaint falls far short of this endeavor and should be dismissed as to these two defendants. As for Town Manager James Gillway, the only mention of his supposed liability appears on the final page of Hofland's supplement to the Fourth Amended Complaint in which Hofland asserts in a conclusory manner: "And given Searsport Town Manager James Gillway's personal involvement with the Searsport Police Department in 2008 plus earlier, including establishing many of its many policies and practices, Gillway and the Town of Searsport bear responsibility for the frauds and torts of their police." (Claim No. 34, Doc. No. 75-1 at 8.) This is precisely the sort of thread-bare statement of a claim of municipal and/or supervisory liability that the majority in Iqbal would identify as warranting dismissal.

Paul Hazard, the individual who signed the search warrant, is not even mentioned in the Fourth Amended Complaint, although he was referenced in earlier versions. Steve Saucier's only alleged conduct is his writing of the incident report noting that Danielson stated she saw a Glock during the roadblock -- alleged in Claim 16 -- that was disseminated by others. There is no 42 U.S.C. § 1983 liability that can attach to this ministerial conduct.[8] The suit should be dismissed against these two defendants.

This relatively easy dismissal of the claims against the Searsport Police Department, the Town of Searsport, Steve Saucier, Eric Bonney, Paul Hazard, and James Gillway, still leaves the

---

[8] I acknowledge that Hofland describes Saucier as "a major coconspirator" (Claim 34, Doc. No. 75-1 at 8) but there is simply too little pled here related to Saucier's conduct to justify keeping him entangled in this litigation.

claims against LaHaye, Danielson, and Larrivee. In his fourteenth claim Hofland avers that on October 23, 2008, Richard LaHaye and Jonah O'Roark "planned and executed, with Searsport Police, a road block and 'safety check' which specifically blocked Hofland's access to the driveway leading to his storage facilities, beginning at about 2100 hours, well after dark." (Claim 14, Doc. No. 75 at 8.) He expands:

> Just two months earlier, Searsport Police reserve officer Michael Larrivee …had invaded that property, refusing to leave when confronted by Hofland, and "running" Hofland's Subaru license plates as well, all as Hofland was organizing his storage in a lockable box trailer.[9] … Larrivee was one of four Searsport Police Officers located at or near Hofland's driveway at 2245 hours on October 23, 2008.

(Id.)

Hofland then shifts his focus to Defendant Danielson (who I think, it is fair to say, is his primary target in this litigation). He alleges:

> As a direct consequence of not just the road block but its design and location at Hofland's driveway, Searsport Police Officer Jessica Danielson, despite warnings from Hofland to stay away from his vehicle due to the highly suspicious circumstances, instead did force her way into the Subaru. She then screamed that Hofland had a gun, initiating an even more dangerous confrontation. But, she did not see a gun, and her willingness to falsify facts thus directly resulted in an unfortunate, and escalating series of events as Danielson's falsifications became widely publicized and part of the official records.

(Claim 15, Doc. No. 75 at 9) (citation omitted).[10]

With regards to LaHaye, Hofland opines in Claim 16:

> Chief LaHaye in particular disseminated falsified facts which libel[]ed Hofland, including Danielson's increasingly continued claims embellished upon contrary evidence purportedly by audio records at the [Waldo County Regional Communication Center] WCRCC, and even Steven Saucier's incident report, as Danielson later claimed she saw a "Glock" pistol. This only added to Danielson's

---

[9] Hofland also links Larrivee to the Waldo County Regional Communication Center during this time and insists that he was the person in control of discovery requests pertaining to his criminal case. He states that he did not receive discovery of the Center's report on this interaction until late in 2010.

[10] Hofland insists that Danielson never saw the gun any time prior to October 31, 2008, and maybe even not until trial. (Claim 27, Doc. No. 75 at 23.)

12

> libels which were widely broadcast via print and telecommunications news media, many disseminated by U.S. Mail and/or interstate wire communication, especially the internet. This has continued for <u>at least</u> sixteen to eighteen months, beginning on October 24, 2008. So <u>much</u> repeated.

(<u>Id.</u>)

It is Hofland's contention that LaHaye ordered the removal of his Subaru "from the private property Hofland had legal right to park it upon, and the resulting towing occurred at least nine hours after the manhunt on October 23, 2008." (Claim 16, Doc. No. 75 at 9.)

Hofland attributes his conduct at the elementary school on October 31, 2008, to his listening to FM radio on his MP3 player while he was evading police after the road-block incident. (Claim 17, Doc. No. 75 at 9-10.) Hofland says that his actions at the school "were all designed to minimize the risk of injury to anyone, Hofland included." (<u>Id.</u> at 10.) "It all lasted a very short time," Hofland reflects, but it "would <u>never</u> have happened but for Danielson's and LaHaye's belligerent libels which were also proceeded by <u>years</u> of obstruction of justice and frauds in New Hampshire and Maine litigations, plus dating to an infamous federal matter." (<u>Id.</u>)

Hofland insists that "Danielson's libels and frauds then incited libels and frauds by other persons, especially at the Stockton Spring Elementary School where a number of adults libeled Hofland along similar lines as Danielson's claims about Hofland pointing a gun at her." (Claim 19, Doc. No. 75 at 11.) Hofland hypothesizes that despite his acquittal on this particular charge "the public still believes Hofland is guilty." (<u>Id.</u> at 12.) He thinks that the defendants' testimony at his trial "deliberately libeled and defrauded Hofland in violation of Hofland's rights." (<u>Id.</u>)

Hofland also maintains that the searches of his storage facility commencing October 24, 2008, "occurred under false pretenses, especially given Danielson's pattern of slander, defamation and libel; plus were designed by the police to mask vandalism of Hofland's property." (Claim 20, Doc. No. 75 at 12.) He represents that an October 28, 2011[sic?] inventory

13

of his property does not list "a number of valuable electronics." (Id. at 14.) Hofland believes that Danielson, under the supervision of LaHaye claimed to execute an 'inventory search' on the morning of October 24, 2008, at a local towing establishment, purportedly absconding with several valuable electronic devices. (Claim 22, Doc. No. 75 at 14.) Apparently Danielson was also involved in a search of Hofland's Subaru which led to the seizure of a box of ammunition and a cell phone. (Id.) It is Hofland's contention that this was a warrantless search. (Id. at 15.) Hofland then maintains that Danielson and LaHaye conspired to obtain the October 28, 2008, search warrant for his Subaru by concealing the earlier search and seizure. (Claim 23, Doc. No. 75 at 15.) Hofland faults Danielson for claiming "that Hofland was on a 'watch list' due to threatening a New Hampshire judge (which now links the dual-mode New Hampshire-federal enterprises to the Perkins enterprises and its state actors.)" (Id. at 15-16.) Hofland faults the police for seeking potential evidence of a connection between Perkins's allegedly stolen property and the property that Hofland possessed in October 2008. (Id. at 16.) In Hofland's view, the October 23, 2008, search warrant was premised on concealed exculpatory information vis-à-vis the 'inventory search' by Danielson, as ordered by LaHaye. (Id. at 17.)[11] He maintains that related documents "slandered, defamed and libel[]ed Hofland, put him in a false light, invaded his constitutionally protected privacy, and resulted in a pattern of fraud and obstructions of justice…" (Id.)[12]

---

[11] One instance of a conspiracy claim that is not cognizable is Claim 24. Hofland seems to be attempting to link present defendant Larrivee with individuals who are not defendants in this action. As I earlier indicated, I am not construing this Fourth Amended Complaint as incorporating new or repeat defendants into the folds of this particular litigation.

[12] I am not going to belabor Hofland's articulation of his conspiracy theories regarding the Searsport Police Department, the Maine State Police, the 'Perkins enterprises,' and "the New Hampshire – federal and dual mode enterprises linked to the Department of Homeland Security (federal) and Wendy Hofland, and New Hampshire Judicial Branch actors." (Id. at 19.) He also references some sort of interaction with a New Hampshire judge John Cyr. (Id. at 20.)

*Unconstitutional Defamation/Libel*

It is rudimentary that statements in court documents and testimony at trial by law enforcement personnel related to a conviction following a criminal investigation do not, standing alone, trigger a constitutional damage claim by the defendant with respect to alleged reputational harm. See Briscoe v. LaHue, 460 U.S. 325 (1983). To state a constitutional claim for reputational harm in this circuit Hofland's pleading must pass the "defamation-plus" test. See Celia v. O'Malley, 918 F.2d 1017, 1021 (1st Cir.1990); see also Paul v. Davis, 424 U.S. 693, 699-700 (1976) (relying on a plurality opinion in Screws v. United States, 325 U.S. 91 (1945)); Pasdon v. City of Peabody, 417 F.3d 225, 228 -29 (1st Cir. 2005); Beitzell v. Jeffrey, 643 F.2d 870, 878 & ns. 17&18 (1st Cir. 1981). These two doctrines are somewhat in tension because obviously Hofland has lost his liberty. However, I am confident that Hofland should not be allowed to proceed with his extravagant damage claims on his theory of unconstitutional reputational harm stemming from these defendants' work on his criminal case. Hofland's loss of liberty arises from a valid criminal conviction in state court and until and unless that conviction is set aside, there is no defamation or libel that is associated with a loss of liberty such as to pass the "defamation-plus" test. Assuming for purposes of this screening decision that these defendants did commit perjury in relationship to the testimony concerning the gun and the inventory of his property, Hofland's predicate remedy was his (alleged) acquittal on the charge.[13]

---

[13] I am in no way suggesting that any of the witnesses in Hofland's state criminal proceedings did commit perjury. Assuming that Hofland was acquitted on a charge of criminal threatening a jury determination in Hofland's favor does not necessarily translate into a factual predicate for perjury. Without straying into records not within the four corners of this Fourth Amended Complaint, if, say, Defendant Danielson did testify that she believed she saw a Glock, the jury could credit the testimony that that was sincerely what she thought and still conclude that the State had not proved the criminal threatening charge by proof beyond a reasonable doubt.

*First Amendment Retaliation*

The footprint of Hofland's First Amendment retaliation claim remains unclear. That is, there is little in Hofland's complaint that suggests that his entanglement with law enforcement on October 23, 2008, had anything to do with a protected First Amendment exercise. It is hard to fathom that his alleged caution to Danielson that she not approach him in his car during the roadblock comes anywhere near meeting this target. See Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994); Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1230 -31 (D.Me. 1996); see generally Wilkie v. Robbins, 551 U.S. 537 (2007).

Hofland waxes about First Amendment retaliation relating to libels of New Hampshire and federal officials in putting him on some sort of watch list that was used against him in the December 2008 special grand jury. (See, e.g., Claim 25, Doc. No. 75 at 21.) He attempts to link all the Maine activity back to 2000 and a brief he purportedly filed in a Ninth Circuit case, Idaho v. Lon Horivchi, invoking 'a continuous tort doctrine.' (Id.)[14] This is a frivolous assertion in view of the confines of the very clearly articulated limitations of the current law suit and given the prior lawsuits wherein Hofland has made similar allegations regarding the alleged "watch list."

*Malicious Prosecution*

Under First Circuit law, a malicious prosecution claim would need to be pursued through the state tort remedy even if it might be equally cognizable as a 42 U.S.C. § 1983 claim under the Constitution. See Reid v. New Hampshire, 56 F.3d 332, 341 (1st Cir. 1995) (concluding that a 42 U.S.C. § 1983 plaintiff could not bring false arrest or arrest without probable cause claims under the Fourth Amendment in a situation where he had an adequate state tort remedy for false

---

[14] I could find no record for a case under the name "Horivchi" in the national PACER database. Whether or not this is the "infamous federal matter" to which Hofland alludes, I have no idea.

arrest); Dore v. Velazquez, 10-CV-11964-RGS, 2011 WL 398190, 1 (D. Mass. Feb.4, 2011) ("The First Circuit holds that where a State recognizes the common-law torts of false arrest and malicious prosecution (as does Massachusetts), a plaintiff is barred from pursuing a due process claim (either substantive or procedural) under § 1983 [in] the federal court. Reid v. New Hampshire, 56 F.3d 332, 336 n. 8, 341 (1st Cir.1995)."); see also Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996)("The law is settled that a garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail. There is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution."). Maine recognizes the tort of malicious prosecution, see Trask v. Devlin, 2002 ME 10, ¶ 11, 788 A.2d 179, 182, and false arrest and imprisonment, Qualey v. Town of Wilton, 540 A.2d 479, 480 (Me. 1988).

*Other Fourth Amendment Grounds*

Although Hofland was staunchly cautioned that this amendment to his complaint must be focused on the security check and direct implications there from -- and although Hofland is a prodigious pro se litigator and this case has been carried-over on our docket for two years because of a potential litigable Fourth Amendment claim -- he has failed to adequately present factual allegations that support a search and seizure Fourth Amendment theory of recovery against these three defendants related to the safety check stop and the subsequent alleged searches. If you strip away Hofland's conclusory allegation of a long-running conspiracy between the police and the Perkins Clan, the only plausible inference from the facts he asserts is that the check-point at which he was stopped was a routine safety check, albeit by the driveway where he had a storage container. Hofland's own allegation is that this was a "safety check"

17

conducted at a Searsport Police roadblock. (Claim 14, Doc. No. 75 at 8.)[15] See Illinois v. Lidster, 540 U.S. 419, 421 (2004) ("This Fourth Amendment case focuses upon a highway checkpoint where police stopped motorists to ask them for information about a recent hit-and-run accident. We hold that the police stops were reasonable, hence, constitutional."); Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 447 (1990) ("This case poses the question whether a State's use of highway sobriety checkpoints violates the Fourth and Fourteenth Amendments to the United States Constitution. We hold that it does not and therefore reverse the contrary holding of the Court of Appeals of Michigan."); see also generally United States v. Williams, 603 F.3d 66 (1st Cir.2010).[16] At this late stage in the game, Hofland has not given the court any factual allegations to move forward to service with a Fourth Amendment claim based on his alleged safety check stop.

With regards to the allegedly missing items from the alleged inventory searches, it is not Hofland's theory that the allegedly misappropriated items were used in his criminal trial against him. His complaint only pleads an improper conversion of certain items, described as valuable electronics, during the alleged searches. See Parratt v. Taylor, 451 U.S. 527 (1981); Hudson v. Palmer, 468 U.S. 517 (1984); Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992). As pled, this random conduct by an officer is not an actionable constitutional claim.[17]

I offer the following additional observations with respect to this screening. Hofland seems to believe that the fact that the United States mail or the internet or other trans-state forms of communication were utilized by the defendants in some way improves the prospects of

---

[15] Hofland asserts that his roadblock barred his access to where he had a storage facility. However, per his own allegations in his Fourth Amended Complaint there is no basis to infer that the safety check was situated in a manner that would particularly block Hofland's personal access. (Id.; id. Claim 15 at 9.) For the purposes of this recommended decision I will assume that the roadblock was at the foot of this particular driveway.
[16] Hofland fled on foot as a consequence of his roadblock interactions. He was not detained until his conduct at the elementary school approximately a week later. See Sitz, 496 U.S. at 450-51.
[17] Hofland seems to insist that his property was intentionally taken, but he also would have no constitutional claim if the loss was through negligence. See Daniels v. Williams, 474 U.S. 327, 328 (1986).

advancing his claims against these defendants. This vision of a substantiation of his constitutional claims is a non sequitor. I think Hofland may have in mind case law related to establishing federal criminal jurisdiction over certain types of interstate misconduct or the elements of a RICO conspiracy. This has no relevance to a private individual's 42 U.S.C. § 1983 claim against state actors for their conduct within the state, at least with respect to how Hofland has finally, definitively set forth his counts against these defendants. In addition, however mightily Hofland insists otherwise, there is no plausible linkage, see Iqbal 556 U.S. __, __, 129 S. Ct. at 1949, between the conduct of the 'state actors' and the non-state actors, i.e., the Perkins Clan and associates.

Finally, in view of the history of Hofland's litigation in this court, the District of New Hampshire, and the First Circuit, it would be entirely within this Court's discretion to actually place filing restrictions on Hofland once he has had his opportunity to object to this 28 U.S.C. § 1915 screening recommended decision. See, e.g. Keyter v. 535 Members of 110th Congress, Nos. 08-1061, 08-1063, 08-1064, 277 Fed. Appx. 825, 827 (10th Cir. May 13, 2008).

## CONCLUSION

As stated above, 28 U.S.C. § 1915(e)(2) provides that this Court shall dismiss an in forma pauperis case that is frivolous or malicious at anytime it determines such is the case. As the docket record of this case and Hofland's several other suits in the court attest, Hofland has been given ample opportunity to state a claim against these defendants. In my view, his 28 § 1915(e)(2) 'anytime' has come.

Should the Court agree with my 28 U.S.C. § 1915(e)(2) analysis, I also suggest to the Court that, in light of the earlier caution to Hofland about his vexatious litigation, this may be a moment for firm filing limitations against this litigant.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings r recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 21, 2011